[No. H031591. Sixth Dist. Oct. 29, 2009.]

BERG & BERG ENTERPRISES, LLC, Plaintiff and Appellant, v. JOHN BOYLE et al., Defendants and Respondents.

1022

## Counsel

Allen Matkins Leck Gamble Mallory & Natsis, Robert R. Moore, Michael J. Betz and Kevin Ryan for Plaintiffs and Appellants.

Winston & Strawn, Robert A. Julian and Nicole P. Dogwill for Defendant and Respondent John Boyle.

O'Melveny & Myers, Meredith N. Landy, Lori E. Romley and Sara M. Folchi for Defendants and Respondents David Britts, Tony Daffer, Barry Eggers, Diana Everett, John Gerdelman, Cliff Higgerson, Joseph Kennedy and Bob Williams.

## Opinion

**DUFFY, J.**—Appellant Berg & Berg Enterprises, LLC, the largest creditor of the failed Pluris, Inc., challenges the trial court's sustaining, without leave to amend, respondents' demurrers to Berg's third amended complaint. Respondents were individual members of Pluris's board of directors. After

they challenged Berg's prior pleadings by successful demurrers and an anti-SLAPP (strategic lawsuit against public participation) motion, Berg's operative pleading alleged a single cause of action for breach of fiduciary duty. Pluris had experienced financial difficulties and had as a result entered into an assignment for the benefit of creditors under Code of Civil Procedure sections 493.010 and 1802.[1] The thrust of Berg's claim, as finally pleaded, was that the individual directors owed a fiduciary duty to Berg and other Pluris creditors on whose behalf Berg is purportedly proceeding. The duty allegedly arose when Pluris either became insolvent or entered into the "zone of insolvency" at some point before the assignment. The directors allegedly breached that duty by electing to make the assignment, thereby extinguishing Berg's plan to use the corporation's alleged $50 million of net operating losses through a chapter 11 bankruptcy reorganization that, according to Berg, would have benefitted it and the other creditors by deriving value from the losses. Berg alleged that the directors had failed to conduct a reasonable investigation into its proposed plan before proceeding with the assignment and had they investigated, they would have seen that pursuing Berg's bankruptcy plan was the only viable way to protect, and thereby satisfy their fiduciary duty to, Pluris's creditors.[2]

We conclude that Berg failed to plead a cognizable claim for breach of fiduciary duty against the individual directors. And even if a cognizable claim had been alleged, on the pleaded facts the business judgment rule insulated the directors from personal liability on the alleged claims for breach of fiduciary duty as a matter of law. We accordingly affirm the judgment of dismissal.

---

[1] An assignment for the benefit of creditors is a recognized but less than comprehensive statutory procedure that is an alternative to liquidation in bankruptcy. (Code Civ. Proc., §§ 493.010 & 1802; *Berg & Berg Enterprises, LLP v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802, 829, fn. 13 [32 Cal.Rptr.3d 325]; *Sherwood Partners, Inc. v. EOP-Marina Business Center, L.L.C.* (2007) 153 Cal.App.4th 977, 981–982 [62 Cal.Rptr.3d 896]; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 710 & 711, pp. 795–798.)

[2] In a previous separate but related action, Berg also sued the assignee for the benefit of creditors, Sherwood Partners, Inc., and its counsel, SulmeyerKupetz, alleging, among other claims, an attorney-client conspiracy to deplete Pluris's assets by generating and paying from them unconscionable attorney fees. Concluding that Berg had failed to plead a viable conspiracy claim against a party and its lawyers and further that the assignee's counsel owed no independent fiduciary duty to Pluris's creditors, we rejected Berg's claims in *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc., supra,* 131 Cal.App.4th 802. On remand, the case apparently settled, with Sherwood assigning whatever claims it had against the individual Pluris directors to Berg, or so Berg alleged below. We express no opinion on the validity of any such assignment and we need not do so in light of our opinion.

## STATEMENT OF THE CASE

### I. *Prior Pleadings and the Trial Court's Rulings on Challenges Thereto[3]*

Berg's initial complaint, on which it proceeded directly on its sole behalf (as opposed to derivatively), named as defendants the respondents here—John Boyle, David Britts, Tony Daffer, Barry Eggers, Diana Everett, John Gerdelman, Cliff Higgerson, Joseph Kennedy, and Bob Williams—all members of Pluris's board of directors at some point. The pleading alleged a single cause of action for breach of fiduciary duty. Underlying the claim was the allegation that at all relevant times, Pluris was operating "in a zone of insolvency" during which its board of directors owed its creditors a fiduciary duty. This alleged duty included "the obligation not just to protect the assets of PLURIS but to affirmatively examine a range of possible courses of action to maximize the value of its remaining assets, not merely to take the course of action most expedient to [the individual directors] and make an Assignment [for the benefit of creditors]." This duty was alleged to have been primarily breached by the directors' having "fail[ed] to explore whether BERG's proposed reorganization [in bankruptcy] would or might have yielded greater assets [than the assignment] for [Pluris's] creditors."

The pleading also alleged as background that some six months before the assignment for the benefit of creditors in July 2002, Pluris and a Berg-related entity had entered into a settlement that liquidated and partially secured what came to be Berg's claim by assignment, and allowed Pluris to seek additional outside financing. In conjunction with the settlement, Berg's principal, Carl Berg, allegedly informed the Pluris directors that if the financing effort failed, Berg "would want to explore ways to derive value from PLURIS beyond the obvious hard and soft assets, including the possibility of obtaining value from the millions of dollars in net operating losses . . . PLURIS ha[d] accumulated. To obtain that value, PLURIS would need to be reorganized under the bankruptcy laws."[4] The pleading further alleged that it was not until after the assignment—during the course of later involuntary bankruptcy proceedings initiated by Berg and two other creditors—that Carl Berg offered the details of his plan to use the company's net operating losses. These details included

---

[3] While only the third amended complaint as the operative pleading is directly relevant to our review of the judgment, we briefly discuss the pleading history as certain prior allegations and court rulings bear on the issues pertinent to that review. We more thoroughly relay the pleaded background facts in conjunction with our discussion of the third amended complaint.

[4] As observed by defendant Boyle at oral argument, Berg references no authority for the proposition that Pluris was required to proceed in bankruptcy in order to use the net operating losses in the manner proposed by Berg because it could not do so through an assignment for the benefit of creditors. For our purposes, we accept as true Berg's allegation that a bankruptcy proceeding was required in order to implement its plan.

that through a bankruptcy reorganization (1) Berg would make a $150,000 cash contribution to Pluris for the benefit of its unsecured creditors; (2) Berg would reduce the unsecured portion of its claim by $1.5 million in consideration for 100 percent of the stock in the reorganized entity plus the assignment of all claims or causes of action that Pluris had the right to pursue; and (3) Berg would further reduce its unsecured claim by $2.5 million in consideration for all of Pluris's noncash assets, including its intellectual property, software, and inventory. All told, the pleading alleged, these plan details would result in the reduction of Berg's unsecured claim by $4 million plus its infusion of $150,000 for the benefit of other unsecured creditors. The import of these background allegations of the initial complaint as relevant here was that they alleged that it was only *after* the assignment for the benefit of creditors had been made and "during" later involuntary bankruptcy proceedings that Berg provided the details of its plan to use Pluris's net operating losses.

Apparently before any responsive pleadings were filed, Berg filed a first amended complaint. The new pleading restated the breach-of-fiduciary-duty claim and added two causes of action for fraudulent and negligent misrepresentation, respectively. It reiterated that before the assignment, Berg had only generally informed Pluris's directors of his desire to explore the use of Pluris's net operating losses through a petition in bankruptcy if Pluris's outside financing efforts failed and that it was only later, during involuntary bankruptcy proceedings, that Berg provided the details of this plan.

Defendant John Boyle demurred to the amended pleading on various grounds. The other directors likewise demurred and some filed an anti-SLAPP motion (under Code Civ. Proc., § 425.16) to the new misrepresentation causes of action, which the other defendants joined. In the face of the anti-SLAPP motion, Berg voluntarily dismissed its two misrepresentation causes of action leaving only its claim for breach of fiduciary duty as the target of the demurrers.[5] The court (Judge C. Randall Schneider) sustained the demurrers with leave to amend. The basis of the order was, in essence, lack of standing—Berg's claim of injury was not unique to itself or to a particular class of creditors but rather incidental to injury that all of Pluris's creditors might have suffered as a result of the assignment for the benefit of creditors. Therefore, the claim was not direct and particular to Berg but rather derivative and assertable only on behalf of all of Pluris's creditors.[6] The court further noted that in light of its dispositive ruling, it need not directly address

---

[5] The court nevertheless concluded that the anti-SLAPP motion was well taken and later awarded defendants statutory attorney fees per this determination.

[6] "An action is derivative, that is, in the corporate right, ' "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." ' (*Jones* [*v. H. F. Ahmanson & Co.* (1969)

another ground raised by demurrer—that the Pluris directors were insulated from liability by the business judgment rule. But, "for the guidance of the parties," the court nevertheless observed that particular allegations of the first amended complaint appeared "sufficient to rebut the business judgment presumption."

Berg filed a second amended complaint, this time on "behalf of [itself] and all other Pluris, Inc. creditors," consistent with the court's prior ruling. The new pleading in substance restated the allegations of Berg's previously asserted breach-of-fiduciary-duty claim, including that before the assignment for the benefit of creditors, Berg had informed Pluris of its desire to explore use of Pluris's net operating losses through bankruptcy in the event Pluris could not obtain outside financing but after the assignment and during later involuntary bankruptcy proceedings, Berg provided details of this plan.

The directors demurred to Berg's second amended complaint on numerous grounds. The court (Judge Neal A. Cabrinha) determined that while the pleading could be "reasonably be interpreted as alleging a creditors' claim under common law," Berg had failed to allege specific facts to rebut the business judgment rule—"affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching, or an unreasonable failure to investigate material facts"—and thus had not stated a viable claim for breach of fiduciary duty. The court ruled that Berg's allegations that the directors did not conduct a "reasonable inquiry into alternative methods of financing or alternative ways to derive additional value in Pluris for its creditors, but instead took the easiest path for themselves and assigned all of Pluris's assets to an assignee" did not establish "that [the] defendants acted with an improper motive and a conflict of interest. . . . [¶] . . . [¶] At first blush, the allegation that defendants did not explore alternative avenues of financing or alternative ways to derive additional value in Pluris for its creditors pleads around the business judgment rule. However, it is not sufficient to generally allege the failure to conduct an active investigation without (1) alleging facts which would reasonably call for such an investigation, or (2) alleging facts which would have been discovered by a reasonable investigation and would have been material to the questioned exercise of business judgment. . . . [¶] . . . The Second Amended Complaint does not allege facts establishing the existence of any alternative methods of financing or means to increase the

---

1 Cal.3d 93, 106 [81 Cal.Rptr. 592, 460 P.2d 464]].)" (*Everest Investors 8 v. McNeil Partners* (2003) 114 Cal.App.4th 411, 425 [8 Cal.Rptr.3d 31].) On the other hand, a creditor's individual or direct claim is one for which the creditor does not seek to recover on behalf of the corporation for injury done to it. The injury need not be different from that suffered by a class of shareholders or be unique to the plaintiff and it still may affect a substantial number of shareholders or in this case, creditors. But the direct claim is simply one that reflects an injury that is not incidental to an injury to the corporation as a whole. (*Id.* at pp. 425–428.)

value of Pluris's assets for the benefit of creditors generally. As a result, it fails to establish a breach of fiduciary duty."

Thus, the court determined that because Berg had failed to plead specific facts to rebut the presumption of nonliability afforded by the business judgment rule, it had failed to adequately plead a cognizable claim for breach of fiduciary duty against the directors. As a result, the court sustained the demurrers with leave to amend.

## II. *Berg's Third Amended Complaint*

This brings us to the operative pleading—Berg's third amended complaint.[7] In it, Berg, for itself and purportedly on behalf of all Pluris creditors, restated its single cause of action for breach of fiduciary duty against the Pluris directors.[8] The pleading alleged in conclusory fashion and without supporting facts that "[a]t least from January 2002, and continuing thereafter, PLURIS was either insolvent or operating within the 'zone of insolvency.' During this time, PLURIS's Board of Directors and each director individually owed a fiduciary duty to act for the benefit of PLURIS's creditors." That duty, as alleged, included "the obligation not just to protect the assets of PLURIS but to affirmatively examine a range of possible courses of action to maximize the value of the remaining assets, not merely to take the course of action most expedient to [the directors] and make an Assignment."

As background, the pleading, like its superseded predecessors, went on to allege that in 2001, one of Pluris's creditors was a Berg-related entity that had entered into a lease with Pluris, which Pluris repudiated, resulting in litigation. That dispute was settled in February 2002 when Pluris informed Berg's principal, Carl Berg, that it was attempting to obtain outside financing to continue operations and that settlement of Berg's claim was a condition to receiving that financing. In the course of these discussions, Carl Berg then informed Pluris, allegedly through its board of directors, that if its financing efforts failed, the Berg-related entity or its assignee "wanted to derive value" or "want[ed] to explore ways to derive additional value" from the $50 million in net operating losses that Pluris had accumulated and that one of Berg's plans for doing so required a reorganization of Pluris through federal bankruptcy laws.[9] The settlement between Pluris and the Berg-related entity

---

[7] We include here only seemingly relevant facts alleged in the 17-page pleading containing a single cause of action.

[8] For the first time, Berg also named Pluris as a defendant, but this is not relevant to the issues on appeal.

[9] This is a bit different from prior pleadings, which had alleged that at this point in time, Berg had only expressed a general desire to "explore" ways to derive value from Pluris's net operating losses, an allegation that is also included in the third amended complaint. As Berg's

liquidated and partially secured the claim, which was then assigned to Berg making it Pluris's largest creditor.

Pluris's efforts to obtain outside financing did not result in its getting sufficient funds to continue operations, as a result of which, on July 11, 2002, Pluris, through its board of directors, made an assignment for the benefit of creditors. According to Berg, in doing so, the directors "failed, refused or neglected to seek or to find any alternative financing or to make a reasonable inquiry into alternative financing even though they knew or reasonably should have known there were a number of potential sources available." The board also "failed to make any reasonable inquiry into alternative ways to derive additional value for the PLURIS creditors other than making an assignment for the benefit of creditors . . . despite the fact that [the directors] were specifically advised there were alternatives that might generate greater value. For example, [Carl] Berg [had] explained [that] if Pluris w[ere] unsuccessful [at obtaining sufficient outside financing], he intended to seek [to benefit from] the value of PLURIS's $50 million [in net operating losses through] a bankruptcy reorganization. Pursuant to the reorganization, there would [be] additional benefits to creditors such as [those] incorporated in the proposed Berg plan." These benefits included the same reduction of Berg's unsecured claim and a cash contribution to the bankruptcy estate of $150,000 for the benefit of other unsecured creditors that we noted from prior pleadings.[10] But, Berg further alleged, "[r]ather than exploring alternative forms of financing, including Berg's plans, . . . the Directors took the easiest path for themselves, and made an assignment of all PLURIS's assets to an assignee for the alleged benefit of creditors, and then 'washed their hands' of the matter." Said yet another way, the directors, as shareholders, "[h]aving determined that their own investment in PLURIS essentially had no value, they looked no further and ignored their continuing duties to the PLURIS creditors by, among other things, refusing to examine alternatives which were specifically brought to their attention or to explore other options, all of which would have enhanced the value to the PLURIS creditors. Instead, they assigned PLURIS's assets to an assignee, and walked away." Berg still further alleged that the directors "did not explore and had no intention of exploring alternative avenues of financing or ways to maximize PLURIS's assets, but instead chose to 'cut

---

counsel later explained, in order to "derive value" from Pluris's net operating losses according to Berg's plan, the corporation had to reorganize through a bankruptcy proceeding and allow Carl Berg "to put a skeleton staff together, run it for a period of time, and take advantage of the net operating losses." Just how this activity by Pluris as a separate business entity could inure to Berg's benefit is not exactly clear.

[10] These were the plan details that prior pleadings had alleged were first proposed by Berg only later, during involuntary bankruptcy proceedings. The third amended complaint alleges, inconsistently with those prior pleadings, that during the involuntary bankruptcy proceedings, Carl Berg "*continued* to offer his plans for reorganization," as if the plan details, or some of them, had been previously put forth before the July 2002 assignment. (Italics added.)

their losses' " by the assignment "without any reasonable inquiry concerning other ways to protect the interests of Berg and the other creditors, despite that several possible alternatives had specifically been brought to their attention by Berg, and other possible alternatives might have been found with modest inquiry."

The pleading then alleged that from the date of the assignment in July 2002 until August 16, 2002, when Berg and two other Pluris creditors filed an involuntary petition in bankruptcy on its behalf, Berg "tried unsuccessfully to contact PLURIS's BOARD OF DIRECTORS" and no member of the board contacted Berg "to explore . . . identifying alternative ways to achieve greater value in PLURIS. Nor did any [director] conduct [a] reasonable inquiry to determine how to protect or enhance the value of PLURIS [or how] to protect BERG's interests, including an inquiry concerning BERG's ability to use PLURIS's [net operating losses]. [¶] . . . At no time between January 2002 and the Assignment . . . did PLURIS's BOARD OF DIRECTORS ever examine means to increase the value of PLURIS's assets for the benefit of creditors generally other than by making an Assignment . . . ."

In the penultimate allegations of the cause of action as relevant here, Berg pleaded that the directors had breached their fiduciary duties by selecting a course of action that was "easiest for them by ignoring alternatives specifically brought to their attention, including BERG's proposed reorganization[,] and [by] failing to make any reasonable inquiry into other possible approaches that would or might have yielded greater assets for the creditors"; and by failing "to explore BERG's articulated plan to maximize the value of PLURIS's [net operating losses for] the benefit [of] creditors."[11]

The pleading further alleged that "[o]n August 16, 2002, in order to protect their interests and the interests of other creditors, three of PLURIS's creditors, including BERG, filed an involuntary petition for bankruptcy [under 11 U.S.C § 303] concerning PLURIS's estate. During the bankruptcy proceeding, Berg continued to offer his plans for [Pluris's] reorganization."[12] In January 2003, at the request of Sherwood, the assignee, the bankruptcy court

---

[11] Berg also pleaded as part of these allegations that the directors had breached their duty by prohibiting Berg from timely using or otherwise disposing of Pluris's assets that secured its obligation to Berg, and, without reference to any specific facts, by "using the remaining PLURIS assets for themselves." But Berg did not pursue these particular allegations below and does not pursue them here. Any claim regarding them has accordingly been forfeited or waived.

[12] See footnote 10, *ante.*

abstained from exercising jurisdiction under title 11 United States Code section 305(a)(1) and dismissed the involuntary petition.[13]

The third amended complaint finally alleged that as a proximate result of the directors' breach of fiduciary duty, which Berg alleged to be willful, malicious, and oppressive so as to justify an award of punitive damages, Berg and the other Pluris creditors were damaged in a sum "in excess of $50 million which includes, but is not limited to, the loss of use of PLURIS's [net operating losses]."

### III. *The Directors' Demurrers and the Trial Court's Ruling*

The directors all demurred to the third amended complaint for its failure to state facts sufficient to constitute a cause of action, reprising many arguments they had raised in previous pleading challenges. On December 21, 2006, the court (Judge Neal A. Cabrinha) issued its order sustaining the demurrers without leave to amend. The court's rationale was that the third amended complaint failed to allege a viable claim for breach of fiduciary duty against the directors. The court relied on *CarrAmerica Realty Corp. v. nVIDIA Corp.* (N.D.Cal., Sept. 29, 2006, No. C 05-00428 JW) 2006 U.S.Dist. Lexis 75399 (*CarrAmerica*), a recent federal Northern District of California case that had not been cited by the parties in their papers.

According to the court, *CarrAmerica* determined that California follows the " 'trust fund doctrine' " with respect to duties owed by corporate directors to creditors that arise upon the corporation's insolvency. The scope of this duty is to avoid " 'divert[ing], dissipat[ing] or unduly risk[ing] assets necessary to satisfy' " creditors' claims. The court observed that because this duty can be characterized as the obligation to avoid the squandering of an insolvent corporation's assets, "recovery for breach of this fiduciary duty generally concerns cases [in which] the directors of an insolvent corporation improperly divert corporate assets. [Citations.] Although no California cases expressly limit the 'fiduciary duty under the trust fund doctrine to the prohibition of self-dealing or the preferential treatment of creditors, the scope of the trust fund doctrine in California is reasonably limited to cases [in which] directors or officers have diverted, dissipated, or unduly risked the insolvent corporation's assets.' [Citation.]"

---

[13] The primary bases of the court's order were that creditors and the debtor would be "better served" by a dismissal of the involuntary petition because Pluris, as a "non-operating company" with "no employees, no ongoing business activities, no accounts receivables or any other source of revenue, and no customers" had already entered into an assignment for the benefit of creditors through which it was being liquidated, not reorganized, and because Carl Berg was not motivated to ensure a fair distribution to Pluris's creditors but rather to gain "control of Pluris and its assets for his potential advantage," which the court viewed as "self serving."

The court noted that the third amended complaint did not meet this standard as it did not allege that the Pluris directors "improperly assigned assets for their own interests, or assigned assets knowing the assignee would breach its fiduciary duty to the creditors." Instead, the pleading alleged only that the directors had failed "to explore a plan suggested by [Berg] that may have made better use of the assets. . . . [Berg's] allegations relating to the conduct of the assignee are irrelevant absent an allegation that the directors were aware that the assignee was unscrupulous or that the directors have an interest in the assignee." The court concluded that because Berg "cannot allege defendants breached their duty not to 'divert, dissipate or unduly risk assets' by [having assigned] the assets for the benefit of [Pluris's] creditors, the demurrers are sustained without leave to amend."

Berg moved for reconsideration of the order under Code of Civil Procedure section 1008, citing *CarrAmerica* as new law and asserting that its claim was not based on the directors' failure to make the best use of Pluris's assets as the court had concluded but rather on their having "knowingly squandered Pluris['s] largest asset"—its net operating losses. This breach of duty, it argued, fell squarely within the parameters of a permissible breach-of-fiduciary-duty claim as defined in *CarrAmerica*—the diversion, dissipation, or undue risking of assets. Moreover, Berg contended, it could plead additional facts to state such a claim as set out in the court's order, namely that the directors had used a "portion of [Pluris's] remaining cash to pay preferred creditors (employee severance payments made days before the assignment)" and that after the assignment, Berg contacted the directors, "reminded them of his plan, complained about the unscrupulous acts of the assignee, and was ignored."

Over defendants' opposition, the court granted reconsideration of its prior order because the court had relied on *CarrAmerica*—a case not initially cited or briefed by the parties. Upon reconsideration, the court affirmed its prior order sustaining the demurrers to Berg's third amended complaint without leave to amend.

Judgment of dismissal was entered on May 7, 2007, and Berg's timely notice of appeal followed.

## DISCUSSION

### I. *Berg's Contentions on Appeal and Standard of Review*

Berg's overarching contention on appeal is that the trial court erred in sustaining the demurrers to its third amended complaint because Berg had stated a viable claim for breach of fiduciary duty and had pleaded facts to

rebut the business judgment rule. Its subsidiary contentions include that the court lacked the power to determine that a claim for breach of fiduciary duty against the directors had not been stated in light of prior demurrer rulings and that Berg should have been granted leave to file a fourth amended complaint.

"A demurrer tests the sufficiency of the complaint as a matter of law; as such, it raises only a question of law. [Citations.]" (*Osornio v. Weingarten* (2004) 124 Cal.App.4th 304, 316 [21 Cal.Rptr.3d 246].) Thus, the standard of review on appeal is de novo. (*Cryolife, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1145, 1152 [2 Cal.Rptr.3d 396].) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; see also *Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 5 [40 Cal.Rptr.3d 205, 129 P.3d 394]; *SC Manufactured Homes, Inc. v. Liebert* (2008) 162 Cal.App.4th 68, 82 [76 Cal.Rptr.3d 73].) Where, as here, a demurrer is to an amended complaint, we may consider the factual allegations of prior complaints, which a plaintiff may not discard or avoid by making " ' "contradictory averments, in a superseding, amended pleading." ' " (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957 [70 Cal.Rptr.3d 501].)

"It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading." (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 213 [197 Cal.Rptr. 783, 673 P.2d 660].) Thus, as noted, in considering the merits of a demurrer, "the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.]" (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 [176 Cal.Rptr. 824]; see also *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216] [court reviewing propriety of ruling on demurrer not concerned with the "plaintiff's ability to prove . . . allegations, or the possible difficulty of making such proof"].)

On appeal, we will affirm a "trial court's decision to sustain the demurrer [if it] was correct on any theory. [Citation.]" (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 808 [50 Cal.Rptr.2d 736], fn. omitted.) Accordingly, "we do not review the validity of the trial court's reasoning but

only the propriety of the ruling itself. [Citations.]" (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757 [62 Cal.Rptr.2d 778].)

Where a demurrer is sustained without leave to amend, the reviewing court must determine whether there is a reasonable probability that the complaint could have been amended to cure the defect; if so, it will conclude that the trial court abused its discretion by denying the plaintiff leave to amend. (*Williams v. Housing Authority of Los Angeles* (2004) 121 Cal.App.4th 708, 719 [17 Cal.Rptr.3d 374].) The plaintiff bears the burden of establishing that it could have amended the complaint to cure the defect. (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320 [25 Cal.Rptr.3d 320, 106 P.3d 976].)

II. *The Trial Court Was Free to Consider Whether Berg Had Stated Facts Sufficient to State a Cause of Action for Breach of Fiduciary Duty on Demurrer to the Third Amended Complaint*

As a preliminary matter, we dispense with Berg's claim that because of prior rulings on demurrers to its superseded pleadings, the trial court lacked jurisdiction to consider whether the third amended complaint alleged a viable cause of action for breach of fiduciary duty. Citing *Bennett v. Suncloud* (1997) 56 Cal.App.4th 91 [65 Cal.Rptr.2d 80] (*Bennett*), Berg contends that the jurisdictional components of Code of Civil Procedure section 1008, the statute governing motions for reconsideration of prior rulings and renewed motions,[14] precluded the court from considering the viability of the breach-of-fiduciary-duty claim and that the only ground open for consideration on demurrer to the third amended complaint was that the claim was barred by the business judgment rule. Berg is mistaken.

*Bennett* did hold that where a prior demurrer was sustained as to some causes of action but overruled as to others, a defendant may not demur again on the same grounds to those portions of an amended pleading as to which the prior demurrer was *overruled*. (*Bennett, supra*, 56 Cal.App.4th at pp. 96–97.) But here, there was only one cause of action and the prior demurrers to that cause of action were *sustained*—a critical difference. And *Bennett* also affirmed the principle that when a plaintiff files an amended pleading in response to an order sustaining a prior demurrer to a cause of action with leave to amend, the amended cause of action is treated as a new pleading and a defendant is free to respond to it by demurrer on any ground. (*Ibid.*; *Clausing v. San Francisco Unified School Dist.* (1990) 221 Cal.App.3d

---

[14] These components are generally that an application for reconsideration of a prior ruling or a renewed motion must be made on new or different facts, circumstances, or law. (Code Civ. Proc., § 1008.)

1224, 1232 [271 Cal.Rptr. 72].) Accordingly, because defendants here demurred to the single cause of action of the new, third amended complaint as to which no prior demurrer had been overruled, the restrictive provisions of Code of Civil Procedure section 1008 are inapplicable.[15]

It also bears noting that in spite of *Bennett*, we have previously concluded that a party is within its rights to successively demur to a cause of action in an amended pleading notwithstanding a prior unsuccessful demurrer to that same cause of action. (*Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 389 [102 Cal.Rptr.2d 125].) Citing earlier case law, we so concluded on the rationale that the " 'interests of all parties are advanced by avoiding a trial and reversal for a defect in pleadings. The objecting party is acting properly in raising the point at his first opportunity, by general demurrer. If the demurrer is erroneously overruled, he is acting properly in raising the point again, at his next opportunity. If the trial judge made the former ruling himself [or herself], he [or she] is not bound by it. [Citation.] And, if the demurrer was overruled by a different judge, the trial judge is equally free to reexamine the sufficiency of the pleading. [Citations.]' [Citation.]" (*Pacific States Enterprises, Inc. v. City of Coachella* (1993) 13 Cal.App.4th 1414, 1420, fn. 3 [17 Cal.Rptr.2d 68].)[16]

Moreover, the role of this court entails review of the trial court's ruling, not its rationale. Thus, even if the trial court here were constrained by its prior rulings in its consideration of the grounds raised on demurrers to the third amended complaint, on review of the judgment, we are not so constrained and are free to render an opinion based on the correct rule of law. (*Bennett, supra*, 56 Cal.App.4th at p. 97.)

For all these reasons, we reject Berg's contention that the trial court erred by disposing of the third amended complaint based on Berg's failure to state a viable claim for breach of fiduciary duty and by not limiting its consideration of the pleading challenge to the bar of the business judgment rule.

---

[15] We further observe that none of the court's prior rulings actually turned on a determination that Berg had stated a viable claim for breach of fiduciary duty. Its order on demurrer to the first amended complaint narrowly determined that Berg could not proceed with its claim directly but must do so derivatively. Its order sustaining the demurrers to the second amended complaint determined that a viable claim for breach of fiduciary duty had not been stated because on the face of the pleading, the business judgment rule barred the claim. In other words, the court did not separate the viability of the breach-of-fiduciary-duty claim from the presumption of the business judgment rule, concluding that a viable claim must plead facts to rebut the presumption.

[16] We have not had occasion to reassess this conclusion in light of *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096–1097 [29 Cal.Rptr.3d 249, 112 P.3d 636], which in essence clarified that parties requesting reconsideration of a ruling or filing a renewed motion must comply with Code of Civil Procedure section 1008.

III. *The Demurrer to Berg's Third Amended Complaint Was Properly Sustained*

A. *The Question of a Duty Owed by Individual Directors to Creditors*

Berg contends that the individual members of Pluris's board of directors owed Berg, and all of Pluris's creditors, a paramount fiduciary duty. The alleged duty arose beginning at a point in time when Pluris entered into that ill-defined sphere known as the "zone of insolvency." Respondent directors appear to accept that they owed creditors a duty of due care upon Pluris's actual insolvency. We begin our analysis by focusing on the question whether the individual directors owed creditors a duty and if so, when the duty arose and its scope.

 It is without dispute that in California, corporate directors owe a fiduciary duty to the corporation and its shareholders and now as set out by statute, must serve "in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders." (Corp. Code, § 309, subd. (a).)[17] This duty—generally to act with honesty, loyalty, and good faith—derived from the common law. (*Lehman v. Superior Court* (2006) 145 Cal.App.4th 109, 120–121 [51 Cal.Rptr.3d 411] [director's fiduciary duty is not liability created by statute]; *Jones v. H. F. Ahmanson & Co., supra,* 1 Cal.3d at pp. 106–110 [discussing common law development of directors' fiduciary duty]; cf. *Pittelman v. Pearce* (1992) 6 Cal.App.4th 1436, 1446–1447 [8 Cal.Rptr.2d 359] [corporate bondholders, unlike shareholders, not owed fiduciary duty; obligations owing are defined by contractual terms of bond].)

There is no analogous statutory authority in California establishing or recognizing that upon a corporation's insolvency, or more vaguely when it enters into a "zone of insolvency," directors instead or also owe a duty to the corporation's creditors. And it is easy to see that especially when a corporation is in financial distress, the interests of the shareholders and the corporation itself may inherently collide with those of the creditors, making any

---

[17] Corporations Code section 309, subdivision (a) provides that "[a] director shall perform the duties of a director . . . in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." A director "who performs the duties of a director in accordance with" this subdivision, as well as other subdivisions that permit reliance on information provided by others under certain circumstances not relevant here, "shall have no liability based upon any alleged failure to discharge the person's obligations as a director." (Corp. Code, § 309, subd. (c).) Accordingly, this section sets forth the standard of care owed by directors and accords directors immunity if they comply with that standard by codification of the common law business judgment rule, which we discuss *post.*

respective duties owed by directors to each constituency potentially in conflict and making the scope of each respective duty elusive and difficult to ascertain.

The modern common law notion that the individual directors of a financially distressed corporation operating in the zone of insolvency or even upon insolvency owe a duty of care to its creditors finds its genesis in *Credit Lyonnais Bank Nederland N.V. v. Pathe Communications Corp.* (Del.Ch., Dec. 30, 1991, No. 12150) 1991 Del.Ch. Lexis 215 (*Credit Lyonnais*), which arose out of the leveraged buyout of MGM-Pathe Communications Co. and which laid the ground for the insolvency exception to the general rule that directors owe exclusive duties to the corporation and its shareholders, but not to creditors. While the Delaware chancellor in *Credit Lyonnais* did not find a breach of any duty in that case, he did posit in the text and in a well-known footnote that "[a]t least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise," i.e., the "community of interests" of those involved with the corporation, including its creditors. (*Credit Lyonnais, supra*, 1991 Del.Ch. Lexis 215 at p. *108 & fn. 55.) The recognition of such a duty was seen to minimize the risk to creditors of directors' "opportunistic behavior" like the disposition of corporate property at "fire-sale prices" or unreasonable risk taking with corporate assets for the sole benefit of shareholders. (*Id.* at pp. *108, fn. 55, *109.)

Subsequent federal and out-of-state decisions discussing *Credit Lyonnais* and grappling with the question and scope of a duty owed to creditors upon insolvency have underscored that when managing a corporation that is insolvent, directors must consider the best interests of the whole "corporate enterprise, encompassing all its constituent groups, without preference to any. That duty, therefore, requires directors to take creditor interests into account, but not necessarily to give those interests priority. In particular, it is not a duty to liquidate and pay creditors when the corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative. Rather, the scope of that duty to the corporate enterprise is 'to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity.' " (*In re Ben Franklin Retail Stores, Inc.* (Bankr. N.D.Ill. 1998) 225 B.R. 646, 655 (*Ben Franklin*); see also, e.g., *Geyer v. Ingersoll Publications Co.* (Del.Ch. 1992) 621 A.2d 784, 789–791; *In re Hechinger Inv. Co. of Delaware* (Bankr. D.Del. 2002) 274 B.R. 71, 89; *In re RSL Com Primecall, Inc.* (Bankr. S.D.N.Y., Dec. 11, 2003, Nos. 01-11457, 01-11469) 2003 Bankr. Lexis 1635, pp. *24–*25; *Production Resources v. NCT Group* (Del.Ch. 2004) 863 A.2d 772, 787–803, overruled in part in *NACEPF v. Gheewalla* (Del. 2007) 930 A.2d 92, 103.)

As generally discussed by the court in *Ben Franklin*, the rationale for the general rule of no duty owed to creditors is that it is the shareholders who own a corporation, which is managed by the directors. In an economic sense, when a corporation is solvent, it is the shareholders who are the residual claimants of the corporation's assets and who are the residual risk bearers. As long as the corporation remains solvent, the business decisions made by management directly affect the shareholders' income; management accordingly owes fiduciary duties to those shareholders as well as to the corporation. The corporation's creditors, on the other hand, are free to protect their interests by contract. As long as the corporation is solvent, no matter how badly managed it might be, it is able to satisfy its contractual obligations to creditors who are therefore unaffected by management's business decisions. But when insolvency arises, the value of creditors' contract claims may be affected by management's business decisions in a way it was not before insolvency. At the same time, as long as insolvency persists, shareholder value is essentially worthless and shareholders no longer occupy the position of residual claimants. Because insolvency shifts the residual risk of management decisions from shareholders to creditors, at least some of the duties formerly owed by directors only to shareholders are owed also to creditors upon that circumstance, or so the theory goes. (*Ben Franklin, supra*, 225 B.R. at pp. 652–656; see also *In re Verestar, Inc.* (Bankr. S.D.N.Y. 2006) 343 B.R. 444, 471–472.)[18]

---

[18] The establishment of a general duty owed by corporate directors to creditors has generated controversy and has not been without a steady stream of broad criticism from commentators. Their writings on the subject focus on matters such as the difficulty of perceiving insolvency, or worse, the zone of insolvency, which is when such duties arise, and the practical difficulties and inefficiencies inherent in directors managing conflicting duties owed to disparate interests, thereby diluting the continuing and historic duty owed by directors to shareholders. Some commentators have even called for the abolition of the duty to creditors. (See, e.g., Lin, *Shift of Fiduciary Duty upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors* (1993) 46 Vand. L.Rev. 1485; Stilson, *Reexamining the Fiduciary Paradigm at Corporate Insolvency and Dissolution: Defining Directors' Duties to Creditors* (1995) 20 Del. J. Corp. L. 1; Schwarz, *Rethinking a Corporation's Obligation to Creditors* (1996) 17 Cardozo L.Rev. 647; Lipson, *Directors' Duties to Creditors: Power Imbalance and the Financially Distressed Corporation* (2003) 50 UCLA L.Rev. 1189; Sahyan, *The Myth of the Zone of Insolvency: Production Resources Group v. NCT Group* (Fall 2006) 3 Hastings Bus. L.J. 181; Bainbridge, *Much Ado About Little? Directors' Fiduciary Duties in the Vicinity of Insolvency* (2006–2007) 1 J. Bus. & Tech. L. 335; Hu & Westbrook, *Abolition of the Corporate Duty to Creditors* (2007) 107 Colum. L.Rev. 1321; Tung, *The New Death of Contract: Creeping Corporate Fiduciary Duties for Creditors* (2008) 57 Emory L.J. 809; McLaughlin, *The Uncertain Timing of Directors' Shifting Fiduciary Duties in the Zone of Insolvency: Using Altman's Z-Score to Synchronize the Watches of Courts, Directors, Creditors, and Shareholders* (Winter 2008) 31 Hamline L.Rev. 145; see also *NACEPF v. Gheewalla, supra*, 930 A.2d at p. 99, fn. 28 [listing many articles on the topic of duties owed to creditors on corporate insolvency].)

There are apparently no published cases in California that rely on or postdate *Credit Lyonnais* and determine, based on acceptance or rejection of its rationale, whether or not in this state, corporate insolvency triggers the existence of fiduciary duties of due care and loyalty owed by directors to creditors. But, as observed by federal cases, there are older California cases that, consistent with *Pepper v. Litton* (1939) 308 U.S. 295, 306–307 [84 L.Ed. 281, 60 S.Ct. 238],[19] apply the " 'trust fund doctrine' " where " 'all of the assets of a corporation, immediately on its becoming insolvent, become a trust fund for the benefit of all of its creditors' " in order to satisfy their claims.[20] (*CarrAmerica, supra,* 2006 U.S.Dist. Lexis 75399 at p. *16, citing *Saracco Tank & Welding Co. v. Platz* (1944) 65 Cal.App.2d 306, 313–318 [150 P.2d 918] [trust fund doctrine applied for statutory liability for dereliction imposed on directors for wrongful distribution of all assets of insolvent foreign corporation for payment to preferred creditors]; *Commons v. Schine* (1973) 35 Cal.App.3d 141, 145 [110 Cal.Rptr. 606] [trust fund doctrine applied to a controlling partner's preference in paying insolvent partnership's debt to his own creditor corporation]; *Title Ins. etc. Co. v. California Dev. Co.* (1915) 171 Cal. 173, 206–207 [152 P. 542] [trust fund doctrine applied to a company controlling an insolvent development corporation's preferential payment of the corporation's debts]; *Bonney v. Tilley* (1895) 109 Cal. 346, 351–352 [42 P. 439] [trust fund doctrine applied to directors of an insolvent corporation, who were also creditors of the corporation and who secured a preference to their claims over other creditors' claims]; *In re Wright Motor Co.* (9th Cir. 1924) 299 F. 106, 109–110 [trust fund doctrine applied based on California law to a director's fraudulent transfer of corporate assets to himself]; see also *In re Jacks* (Bankr. 9th Cir. 2001) 266 B.R. 728, 736 [trust fund doctrine applied under California law to a director's use of an insolvent corporation's assets to guarantee a personal debt].)

As observed in *CarrAmerica* and by the trial court here, recovery for breaching the fiduciary duties imposed under the trust fund doctrine in California "generally pertains to cases where the directors or officers of an insolvent corporation have diverted assets of the corporation 'for the benefit

---

[19] *Pepper v. Litton* is a seminal United States Supreme Court case that established, among other things, that controlling shareholders, like directors, owe fiduciary duties that are "designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." (*Pepper v. Litton, supra,* 308 U.S. at p. 307, fn. omitted.) Transactions by such fiduciaries with the corporation therefore are rigorously scrutinized and must meet standards of good faith and inherent fairness from the viewpoint of the corporation and its interested constituencies, which include creditors. Such transactions must under all the relevant circumstances "carr[y] the earmarks of an arm's length bargain." (*Id.* at pp. 306–307, fn. omitted.) Transactions that fail to meet this standard may be set aside in a bankruptcy court under its equity powers. (*Ibid.*) The factual context of the case involved fraud and misconduct by the dominant shareholder amounting to self-dealing, none of which is even alleged here.

[20] For an excellent discussion of the trust fund doctrine under Delaware law, see *In re JTS Corp.* (Bankr. N.D.Cal. 2003) 305 B.R. 529, 535–536.

of insiders or preferred creditors.' [Citations.]" (*CarrAmerica, supra,* 2006 U.S.Dist. Lexis 75399 at pp. *16–*17.) While no California cases "expressly limit the fiduciary duty under the trust fund doctrine to the prohibition of self-dealing or the preferential treatment of creditors, the scope of the trust fund doctrine in California is reasonably limited to cases where directors or officers have diverted, dissipated, or unduly risked the insolvent corporation's assets." (*Id.* at p. *17.) In other words, the doctrine is not applied to create a duty owed by directors to creditors solely due to a state of corporate insolvency. Application of the doctrine requires, in addition, that directors have engaged in conduct that diverted, dissipated, or unduly risked corporate assets that might otherwise have been used to satisfy creditors' claims.

■ Accordingly, based on this established doctrine, we conclude that under the current state of California law, there is no broad, paramount fiduciary duty of due care or loyalty that directors of an insolvent corporation owe the corporation's creditors solely because of a state of insolvency, whether derived from *Credit Lyonnais* or otherwise. And we decline to create any such duty, which would conflict with and dilute the statutory and common law duties that directors already owe to shareholders and the corporation. We also perceive practical problems with creating such a duty, among them a director's ability to objectively and concretely determine when a state of insolvency actually exists such that his or her duties to creditors have been triggered. We accordingly hold that the scope of any extracontractual duty owed by corporate directors to the insolvent corporation's creditors is limited in California, consistent with the trust fund doctrine, *to the avoidance of actions that divert, dissipate, or unduly risk corporate assets that might otherwise be used to pay creditors claims.* This would include acts that involve self-dealing or the preferential treatment of creditors.[21] Further, because all the California cases applying the trust fund doctrine appear to have dealt with actually insolvent entities, and because the existence of a zone or vicinity of insolvency is even less objectively determinable than actual insolvency, we hold that there is no fiduciary duty prescribed under California law that is owed to creditors by directors of a corporation solely by virtue of its operating in the "zone" or "vicinity" of insolvency.[22]

---

[21] As Berg has not pleaded facts supporting fraud or concealment by the directors, we have no occasion to address that circumstance in our discussion. Nor does our conclusion displace the general obligation owed by all persons under Civil Code section 1708, which recognizes that "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights."

[22] And we observe that the "vicinity of insolvency" breach-of-fiduciary-duty theory of liability was recently rejected, along with that of direct (as opposed to derivative) individual claims by creditors against directors of an insolvent corporation for breach of fiduciary duty, by the Delaware Supreme Court in *NACEPF v. Gheewalla, supra,* 930 A.2d at pages 101–103.

■ Applying the scope of duty defined by the trust fund doctrine, and according truth to the well-pleaded facts of Berg's third amended complaint while ignoring its contentions, deductions, and conclusions of fact or law, we, like the trial court, conclude that the pleading fails to state facts constituting a cognizable claim for breach of fiduciary duty. Assuming a state of actual insolvency, which is not well pleaded here by facts,[23] and apart from the speculative and contingent nature of Berg's or Pluris's ability to actually carry forward and use Pluris's net operating losses against future income,[24] the thrust of Berg's claim, pleaded repeatedly, is as follows: The directors effected the assignment for the benefit of creditors, a recognized statutory alternative to liquidation through bankruptcy (*Credit Managers Assn. v. National Independent Business Alliance* (1984) 162 Cal.App.3d 1166,

We further observe that when an insolvent corporation files for relief in bankruptcy, duties owed to creditors as beneficiaries of the bankruptcy estate are then governed by the federal bankruptcy laws.

[23] There are multiple definitions of insolvency. Corporations Code section 501 provides, for example, that a corporation is insolvent, if, as a result of a prohibited distribution, it would "likely . . . be unable to meet its liabilities . . . as they mature." But there is also insolvency in the balance sheet sense in which the value of liabilities exceeds the value of assets. (*In re Kallmeyer* (Bankr. 9th Cir. 1999) 242 B.R. 492, 496–497 [affirming bankruptcy court's use of balance-sheet test for corporate insolvency in applying Oregon's trust fund doctrine in 11 U.S.C. § 523(a)(4) context].) Berg did not plead any facts establishing Pluris's insolvency at any specific point in time under any test, only the conclusion that at all relevant times, the corporation was insolvent or in the zone of insolvency. In the Ninth Circuit Court of Appeals, a finding of insolvency by the standard of a debtor not paying debts when they become due requires more than merely establishing the existence of a few unpaid debts. (*In re Dill* (9th Cir. 1984) 731 F.2d 629, 632.)

[24] Net operating losses, whose value depends on future income against which to apply them, have been considered property of a bankruptcy estate for purposes of title 11 United States Code sections 541(a)(1) and 548(a)(1). (*In re Russell* (8th Cir. 1991) 927 F.2d 413, 416–417; *In re Prudential Lines Inc.* (2d Cir. 1991) 928 F.2d 565, 571–573.) In order to obtain benefit from net operating losses, an entity must comply with title 26 United States Code section 382 concerning ownership, control, and continuity of business enterprise and may not run afoul of title 26 United States Code section 269, which prohibits the use of net operating losses when control of a company is acquired principally to evade taxes. Treasury regulations also limit and define an entity's ability to carry forward and use net operating losses. (See Trower, Federal Taxation of Bankruptcy and Workouts (1993) ¶ 7.08[6], pp. 7-91 to 7-96; II Weil et al., Reorganizing Failing Businesses (rev. ed. 2006) pp. 22-12 to 22-21.) We need not decide whether Pluris would have been able to comply with the complex federal statutes and Internal Revenue Service regulations concerning a taxpayer's ability to carry forward net operating losses in order to offset future gain, particularly in the context of a bankruptcy organization. Nor could we, given all the practical contingencies associated with that course of action, including but not limited to Pluris's ability to continue operations as a debtor in bankruptcy and its ability to generate future income against which to offset accumulated net operating losses. It suffices to say that directors contemplating a course of action such as a bankruptcy reorganization in an inherently speculative attempt to benefit from the corporation's net operating losses by carrying them forward to offset against potential gain would be engaging in a complex exercise of business judgment involving much risk that the endeavor would not ultimately be successful.

1169–1170 [209 Cal.Rptr. 119]), rather than investigating, exploring or pursuing a bankruptcy reorganization, through which Berg theoretically could have maximized the value of Pluris's accumulated net operating losses and the other creditors could have benefited from Berg's reorganization plan.[25]

These facts do not involve self-dealing or prohibited preferential treatment of creditors and further do not constitute the actual diversion, dissipation, or undue risking of Pluris's assets that were otherwise available to pay creditors' claims. At most, and contrary to Berg's contentions on appeal, these facts allege that another course of action, if explored and pursued, might have offered more value in the end or that beneficial, maximum, or more valuable use could thereby have been made of Pluris's net operating losses, assuming that the many contingencies required to successfully do so all would have transpired favorably. And to the extent the claim asserts that the breach was the failure to have contacted Berg in order to more fully explore the details of its reorganization plan before making the assignment, that failure alone cannot, as a matter of law, have constituted the diversion, dissipation, or undue risking of assets that could have otherwise been used to pay creditors' claims. Because of the inherently speculative and contingent nature of the plan, with or without its details, the obvious risks and costs associated with pursuing it would not have been eliminated by discussions with Carl Berg or anyone else.

Moreover, Berg did not plead facts that identified sources of funds or financing through which Pluris could have continued to operate even in bankruptcy, and thereby potentially generate profit within the allowed time period, which was necessary to successfully carrying forward and using the

---

[25] We consider the new allegations of Berg's third amended complaint, that in February 2002, well before the assignment, Carl Berg informed the Pluris directors of some details of his reorganization plan, i.e., reduction of Berg's unsecured claim and its contribution of $150,000 to be apportioned among those other creditors, to be sham. Berg's superseded pleadings, of which we take judicial notice, clearly alleged that in February 2002, Carl Berg expressed *only* his desire to explore the use of Pluris's net operating losses if it was unable to obtain outside financing and that it was *only after* the assignment and during involuntary bankruptcy proceedings that Berg first offered any details of his plan. The later amendments to these allegations are inconsistent with these prior allegations. Under the sham-pleading doctrine, admissions in an original complaint that has been superseded by an amended pleading remain within the court's cognizance and the alteration of such statements by amendment designed to conceal fundamental vulnerabilities in a plaintiff's case will not be accepted. (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425–426, fn. 3 [42 Cal.Rptr.3d 807] [if a party files an amended pleading and attempts to avoid defects of original complaint by either omitting facts that rendered prior complaint defective or adding facts inconsistent with prior allegations, court may take judicial notice of prior pleadings and disregard inconsistent allegations or read into amended complaint the allegations of the superseded complaint]; *Patane v. Kiddoo* (1985) 167 Cal.App.3d 1207, 1213 [214 Cal.Rptr. 9].) We accordingly disregard the subject allegations of the third amended complaint and read into the operative pleading the previous allegations on the matter.

net operating losses; it did not plead facts identifying options other than bankruptcy and reorganization according to its own plan through which Pluris could have carried-forward its net operating losses; and it did not plead facts alleging just how, if they had not been squandered or had been better protected, the carry-forward of Pluris's accumulated net operating losses through bankruptcy could have been actually used *to pay or satisfy Berg's or its other existing creditors' claims*—the operative standard. (*CarrAmerica, supra*, 2006 U.S.Dist. Lexis 75399 at p. *20 [secret agreement by directors unrelated to protecting corporate assets in order to satisfy creditors' claims cannot form basis of breach of fiduciary duty]; *Ben Franklin, supra*, 225 B.R. at pp. 655–656 [existence of duty not to divert, dissipate, or unduly risk assets is only to protect creditors' contractual and priority rights and is only there to guard against risk that creditors' claims would be defeated by directors giving shareholders preferred rights to assets, which did not occur by prolongation of corporate life that did not result in creditors receiving less than full value for their claims].) Nor, as noted by the trial court, did Berg allege facts about the assignee, Sherwood Partners, Inc., that would have been discovered by reasonable inquiry and that would have foretold any breach by it of a fiduciary duty to creditors or other misconduct detrimental to them.

No matter how Berg now characterizes or packages the basic factual underpinnings of its claim, its allegations fail to state a cognizable cause of action for breach of fiduciary duty against the directors based on the trust fund doctrine, i.e., that the directors of the insolvent Pluris engaged in misconduct, self-dealing, or the prohibited preferential treatment of creditors, or that they diverted, dissipated, or unduly risked corporate assets that otherwise could have been used to pay or satisfy creditors' claims. The trial court was therefore correct in sustaining the demurrers to Berg's third amended complaint. Notwithstanding its many allegations about the directors' conduct while Pluris was in the zone of insolvency or even actually insolvent, the pleading still fails to state facts sufficient to constitute a cause of action for breach of fiduciary duty by the directors' having diverted, dissipated, or unduly risked corporate assets that might otherwise have been available to satisfy creditors' claims.

### B. *The Bar of the Business Judgment Rule*

Even if we had determined that Berg had otherwise pleaded a cognizable claim for breach of fiduciary duty, we would still conclude that the directors are immune from liability on the claim based on the business judgment rule and, therefore, that the demurrers were correctly sustained.[26]

---

[26] And based on these dispositive conclusions, we need not address respondents' other bases for challenging Berg's third amended complaint, including lack of standing, the failure to plead

As noted, the business judgment rule has been codified in California at Corporations Code section 309. But the common law rule "has two components—one which immunizes directors from personal liability if they act in accordance with its requirements, and another which insulates from court intervention those management decisions which are made by directors in good faith in what the directors believe is the organization's best interest. [Citation.] Only the first component is embodied in Corporations Code section 309." (*Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 714 [57 Cal.Rptr.2d 798] (*Lee*); see *Lambden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 257 [87 Cal.Rptr.2d 237, 980 P.2d 940].) The broader rule is " ' "a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions." ' (*Barnes* [*v. State Farm Mut. Auto Ins. Co.* (1993) 16 Cal.App.4th 365,] 378 [20 Cal.Rptr.2d 87]; *Gaillard v. Natomas Co.* [(1989) 208 Cal.App.3d 1250,] 1263 [256 Cal.Rptr. 702].) [It] is based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes. (*Barnes, supra*, 16 Cal.App.4th at p. 378; *Eldridge v. Tymshare, Inc.* (1986) 186 Cal.App.3d 767, 776 [230 Cal.Rptr. 815].) The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. (*Katz v. Chevron Corp.* (1994) 22 Cal.App.4th 1352, 1366 [27 Cal.Rptr.2d 681]; *Barnes, supra*, 16 Cal.App.4th at pp. 379–380.)" (*Lee, supra*, 50 Cal.App.4th at p. 711.) " 'A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose." [Citation.]' " (*Katz, supra*, 22 Cal.App.4th at p. 1366.)

An exception to the presumption afforded by the business judgment rule accordingly exists in "circumstances which inherently raise an inference of conflict of interest" and the rule "does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest." (*Everest Investors 8 v. McNeil Partners, supra*, 114 Cal.App.4th at p. 430; see *Lee, supra*, 50 Cal.App.4th at p. 715.) But a plaintiff must allege sufficient facts to establish these exceptions. To do so, more is needed than "conclusory allegations of improper motives and conflict of interest. Neither is it sufficient to generally allege the failure to conduct an active investigation, in the absence of (1) allegations of facts which would reasonably call for

---

recoverable damages, and what appears to be a form of collateral estoppel based on the bankruptcy court's prior dismissal of the involuntary petition.

such an investigation, or (2) allegations of facts which would have been discovered by a reasonable investigation and would have been material to the questioned exercise of business judgment." (*Lee, supra,* at p. 715.) In most cases, "the presumption created by the business judgment rule can be rebutted only by affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts. [Citation.] Interference with the discretion of directors is not warranted in doubtful cases." (*Ibid.*)

■ And contrary to Berg's contention, the failure to sufficiently plead facts to rebut the business judgment rule or establish its exceptions may be raised on demurrer, as whether sufficient facts have been so pleaded is a question of law. (*Lee, supra,* 50 Cal.App.4th at pp. 711–717 [judgment of dismissal following sustaining of demurrer affirmed on appeal for complaint's failure to have pleaded facts establishing exception to business judgment rule]; *Barnes v. State Farm Mut. Auto. Ins. Co., supra,* 16 Cal.App.4th at pp. 378–379 [judgment of dismissal after sustaining of demurrer affirmed in part due to failure to allege facts rebutting business judgment rule]; *Findley v. Garrett* (1952) 109 Cal.App.2d 166, 177–179 [240 P.2d 421] [affirmance of sustained demurrer as pleading failed to allege fraud or bad faith as exception to business judgment rule].)

Berg acknowledges the elements of the business judgment rule but contends that it has sufficiently pleaded facts to rebut it. Specifically, it contends that it alleged facts that the directors failed to conduct a reasonable investigation into ways to protect Berg's interests when Pluris was in the zone of insolvency; and that given the information the board initially had about Berg's intention to use Pluris's net operating losses, it failed to investigate the details of Berg's bankruptcy reorganization plan or any other plan that would have facilitated such use, instead eliminating the possibility of deriving value from the losses by entering into the assignment. But what Berg has essentially alleged are not facts but the conclusion that the board simply did nothing by way of investigation of alternatives to the assignment. And the facts that are alleged—Pluris being in the zone of insolvency and the directors' knowledge of Berg's intention to explore ways to use Pluris's net operating losses—do not, without more, rebut the presumption.

First, as we have already concluded, in this state, corporate directors do not owe a fiduciary duty to creditors by reason of the corporation being in the zone or vicinity of insolvency. Under the trust fund doctrine, upon actual

insolvency, directors continue to owe fiduciary duties to shareholders and to the corporation but also owe creditors the duty to avoid diversion, dissipation, or undue risk to assets that might be used to satisfy creditors' claims. Under these circumstances, and even accepting as true Pluris's state of actual insolvency at the time of the assignment for the benefit of creditors and the directors' knowledge that Berg wished to use Pluris's net operating losses through a bankruptcy reorganization, the directors were not obliged to contact Berg or to pursue speculative, contingent and potentially risky and costly alternatives to the assignment simply in order to facilitate Berg's plan. The directors did not owe a paramount duty of loyalty to Berg over and above shareholders or other constituencies comprising the collective interests in the corporate enterprise that gave rise to an obligation to put Berg's interests above these other constituencies or to explore ways to facilitate Berg's desires above all else. This is particularly so when the asset—the net operating losses—the value of which Berg claims was not maximized was not a source of actual payment of creditors' claims.

Moreover, Berg did not plead facts demonstrating the availability of viable alternate sources of financing or facts that made the board's decision to enter into the assignment irrational, unsound, or unreasonable had the directors merely conducted an adequate investigation into alternatives before doing so. Although Berg alleged the conclusion that the details of its reorganization plan would have benefited creditors, it did not allege facts establishing that its plan could have practically and reasonably been implemented or that its plan was less risky, less costly, or likely to succeed so as to enable Pluris or Berg and other creditors to benefit from its net operating losses. Nor did Berg allege facts identifying any other viable alternatives. Although Berg alleged in conclusory fashion a failure by the directors to investigate its plan, the pleading fails to state facts that reasonably called for further investigation or facts about its plan that if discovered by such investigation would have been material to the questioned exercise of business judgment. (*Lee, supra*, 50 Cal.App.4th at p. 715.) Berg suggests that it has pleaded a total abdication by the directors of their corporate responsibilities and an utter failure by the directors to diligently exercise their business judgment. (*Gaillard v. Natomas Co., supra*, 208 Cal.App.3d at pp. 1263–1264 [business judgment rule does not immunize directors for abdication of duty by closing their eyes to what is going on in the conduct of the business].) But the mere fact of the assignment and the failure by the directors to pursue Berg's bankruptcy reorganization plan or some other unidentified alternative do not, as a matter of fact or law, establish abdication of duty; the failure to have exercised judgment with reasonable care, skill, and diligence; or even an unreasonable failure to have investigated so as to rebut or allege exceptions to the business judgment rule.

As noted, the business judgment rule has two components—immunization from liability that is codified at Corporations Code section 309 and a judicial policy of deference to the exercise of good-faith business judgment in management decisions. We conclude that based on the allegations of Berg's third amended complaint that do not rebut the presumption afforded by the rule, both components apply here. Even if an otherwise cognizable claim for breach of fiduciary duty against the directors had been pleaded, the claim would still be barred by the business judgment rule. Accordingly, the demurrers would have properly been sustained on this ground as well.

### IV. *The Court Did Not Abuse Its Discretion in Denying Leave to Amend*

As noted, a reviewing court must determine whether there is a reasonable possibility that a pleading as to which a demurrer has been sustained without leave to amend is capable of amendment to cure the defect. And it is the plaintiff who bears the burden of establishing that it is. (*Williams v. Housing Authority of Los Angeles, supra,* 121 Cal.App.4th at p. 719; *Campbell v. Regents of University of California, supra,* 35 Cal.4th at p. 320.)

Berg contends in its opening brief[27] that its third amended complaint can be still further amended to state new allegations establishing a viable cause of action for breach of fiduciary duty. The new allegations are: (1) The directors knowingly dissipated an asset—the net operating losses—by ceasing operations and making the assignment knowing that it would destroy the "creditors' ability to obtain" the losses; (2) Before the assignment, the directors paid preferred claims to employees with remaining cash;[28] (3) After the assignment, the directors became aware of the assignee's unscrupulous conduct in wasting Pluris's assets and did nothing about it. None of these allegations would cure the pleading defects we have identified so as to state a cognizable claim.

The first proposed allegation alleges nothing more or new in factual substance from that which is already alleged in the third amended complaint. Moreover, the directors' acts of knowingly ceasing operations and making the assignment, without more, do not constitute the intentional dissipation of an

---

[27] To the extent Berg offered that it could allege other additional or different facts in its motion for reconsideration below, the same have been waived or forfeited on appeal for Berg's failure to raise them in its briefing.

[28] Berg does not identify these allegedly preferred creditors as employees in its opening brief but they were identified by Berg as such in the court below.

asset that could otherwise be used to pay or satisfy creditors' claims. Accordingly, the allegation does not cure the existing failure to state a viable claim for breach of fiduciary duty under the trust fund doctrine.

As to the second allegation that the directors paid unidentified preferred employee wage or severance claims of unstated amounts just before the assignment, such claims are generally entitled to legal preference under state law governing assignments for the benefit of creditors (Code Civ. Proc., § 1204) and under federal bankruptcy law (11 U.S.C. § 507(a)(4)), as respondents point out. Thus, without other facts, such payments would not constitute the diversion, dissipation, or undue risking of assets that would amount to a cognizable claim for breach of fiduciary duty.

Berg's third and final proposed new allegation is conclusory in that it states without specific facts that the directors became aware of the assignee's "unscrupulous" behavior in wasting Pluris's remaining assets after the assignment but did nothing about it, without specifically stating just what the directors could or should have done. Even more problematic is that the allegation does not state that the directors knew of facts *before* the assignment suggesting that the assignee would commit waste yet proceeded with the assignment anyway to the detriment of creditors. After the assignment, the assignee assumed the duty to marshal and protect Pluris's assets and the directors were thus no longer managing Pluris's affairs. (*Sherwood Partners, Inc. v. EOP-Marina Business Center, L.L.C., supra*, 153 Cal.App.4th at p. 983.) It follows that they, as individuals, ceased to owe any duty as directors to Pluris's creditors and were not legally responsible for acts of the assignee. Finally, as respondent Boyle argues, the factual allegation that Berg contacted the directors after the assignment to inform them of the assignee's unscrupulous conduct directly contradicts existing allegations of the third amended complaint to the effect that after the assignment, Berg was not in contact with the directors, and indeed was unable to contact them, and that Pluris then had no functioning board. Under the sham pleading doctrine, we are free to disregard inconsistent allegations offered for amendment and we do so here.

In sum, Berg has not demonstrated that it can allege new facts that would cure the defects we have concluded exist in its third amended complaint. Based on the proposed new allegations, we remain unconvinced of the possibility that Berg's pleading can be amended to overcome these defects. Accordingly, we further conclude that the trial court did not abuse its discretion in sustaining the demurrers without leave to amend.

## DISPOSITION

The judgment is affirmed.

Mihara, Acting P. J., and McAdams, J., concurred.

A petition for a rehearing was denied November 24, 2009, and appellant's petition for review by the Supreme Court was denied February 3, 2010, S178524. George, C. J., did not participate therein.